## GUERARD *v.* THE LOVSPRING.

### (*District Court, D. South Carolina.* May 16, 1890.)

**1. SALE—WHEN TITLE PASSES.**
  Libelant contracted to sell and deliver along-side of a chartered vessel, for loading, a quantity of phosphate rock. He had a copy of the charter-party in his possession, and selected the stevedore and lighterman himself to deliver the rock. After several lighters had been delivered and made fast to the vessel, one of them capsized. Libelant took bills of lading to his own order, and surrendered the receipts of the ship-master for all the rock except the load thus lost, the receipt for which he retained. *Held,* that libelant showed an intent not to pass the property in the lost rock, but to retain the *jus disponendi,* and a suit therefor against the vessel was properly brought in his own name as owner.

**2. ADMIRALTY—PROCEEDING IN REM.**
  The charter-party provided for delivery of the rock, "the cargo to be brought along-side and taken from along-side free from expense and risk to the ship," and the charterer reserved "the option of appointing stevedore for loading at the ship's expense." There was no provision that the stevedore was to act under the master's orders. Part of the rock was towed to the ship in lighters, and made fast, and receipts therefor were given by the master. One of the lighters, after being fastened, capsized, losing her load. *Held,* that an action *in rem* for the lost rock could not be maintained against the vessel.

In Admiralty.
*Brawley & Barnwell,* for libelant.
*J. P. K. Bryan,* for claimant.

SIMONTON, J. The libel is filed for the recovery of the value of a lighter load of phosphate rock. Libelant on 26th December, 1889, by sale bill, sold to one Gesterding, of Hamburg, Germany, about 2,000 tons kiln-

dried phosphate rock of a certain quality and price, for delivery January, February, along-side vessel, cash against documents. Vessel to load as much of cargo as possible at phosphate works, near Charleston, S. C.; balance to be lightered down to city by seller. Thereupon Gesterding entered into a charter-party with the owner of the Lovspring, and sent her to this port for a load of rock. The special provisions of the charter-party will be noted when needed. It required the captain to apply for cargo at Charleston to the libelant. This he did. Libelant directed him to the Rose Phosphate Works, on Ashley river. The bark then took in part of her cargo, and dropped down the stream, and anchored for the remainder. Libelant engaged Thomas Young as stevedore, and hired from Young a tug and lighters. Two lighters, with phosphate rock, were towed down to the bark on the evening of 26th March, reaching her at 8 o'clock, and the lighters were made fast to the bark, each with two lines, the tug furnishing one for each lighter, the bark the others. The master gave to the tug-master a receipt for the two lighters with phosphate rock in good order. For some reason Young and the master could not agree, and with the consent of both parties Lee was substituted as stevedore, and went aboard with his gang about 1 P. M. on 27th March. One of the lighters capsized about 2 o'clock on that day, losing her load. The mates and crew of the bark say that they noticed nothing about the lighter indicating this until it went over. A witness not connected with this case, whose place of business was on shore about 200 yards opposite to the bark, says that the lighter showed a list at 7 A. M., and that this gradually increased until she went over. When the tug had made fast the lighters she went away, leaving none of her men in charge, and no one on behalf of the lightermen came back to look after the lighters.

The first question made in this case is, in whose name should the action be brought? The claimant contends that Guerard, by his contract with Gesterding, agreed to deliver the rock along-side the vessel; that he alleges and has offered proof that he did deliver this rock along-side; that the property, if this be so, passed to his vendee, who alone can sue. The contract of sale in this case was not for a specific chattel. It was for about 2,000 tons of phosphate rock. It would have been satisfied by the delivery of any rock answering the character and quality of that agreed to be delivered. In such a case the appropriation, in that sense of the term which alone would pass the property from the vendor to the vendee, is not complete so long as the vendor shows by some act his determination to retain *jus disponendi*. This act may be in the form of the bill of lading which he requires. Equally so would be his retention of the ship's receipts to the lightermen, which must be surrendered for the bill of lading. *Wait* v. *Baker*, 2 Exch. 1; *Van Casteel* v. *Booker*, Id. 691; *Turner* v. *Trustees*, 6 Exch. 543; *Gabarron* v. *Kreeft*, L. R. 10 Exch. 274. Mr. Benjamin, in his book on Sales, 328 *et seq.*, cites these cases and many others. His conclusion upon the cases, among others, is this: "(5) Although, as a general rule, the delivery of goods by the vendor on board the purchaser's own vessel is a delivery to the purchaser and passes the property,

yet the vendor may by special terms restrain the effect of such delivery, and reserve *jus disponendi*, even in cases in which the bills of lading show that the goods are free of freight because owners' property. And on a sale of goods which are not specific, although the goods have been delivered on board a ship of, or chartered by, the purchaser, yet, in the absence of any appropriation of the goods in the fulfillment of the contract previous to shipment, the fact that the vendor has taken a bill of lading to his own order, or that of a third person, will prevent the property in them from passing to the purchaser." Amer. Ed., by Kerr.

In the present case, libelant when he finished loading the bark took the bills to his own order. He did not include in these bills the lost rock, nor did he require the master to do so, as was done in *Bulkley* v. *Cotton Co.*, 24 How. 386. He did not demand a separate bill for this rock. He surrendered all the other receipts to his lighterman. He retained that for this lost lighter. Thus he demonstrated his intent not to pass the property and to retain *jus disponendi*. He accepts the loss as his, and it goes without saying that his vendee concurs with him. This does not in any way affect the bark, or deprive her of any advantage of position she would otherwise enjoy. If the lost rock be the property of the charterer, and he brought this action, he would be bound by and and she would be protected by all the terms, limitations, conditions, and exceptions of the charter party. But so, also, is the libelant. He was the agent in that behalf of the charterer, had in his possession a copy of the charter-party, selected the stevedore, engaged the lighterman. He delivered the rock, or attempted to deliver it, under this charter-party, and solely because of it. He knew precisely how, in what capacity, under what limitations, qualifications, and exceptions, the cargo was sent to the bark in the stream. He is as much bound as the charterer would be. He could not treat this vessel as a common carrier. He knew that she was not a general ship, up for a general cargo, carrying goods for any one offering them. Macl. Shipp. 115, 391. He knew that she was under special charter to one man for this voyage for one purpose, and with all her freight room engaged. This action is properly brought in his name, and, as he alleges, as owner.

Our next inquiry is, has he a cause of action *in rem* against the bark? By his own contract and that of the charter-party, a portion of the cargo was to be delivered in the stream. His responsibility for this portion depends upon the express contract, and, where this is silent, upon the general usage subject to which the contract was made. Maude & P. Shipp. 136. This charter-party provides:

"The cargo to be brought along-side and taken from along-side free of expense and risk to the ship, any custom of the port to the contrary notwithstanding. Ship to receive cargo at charterer's wharf if required, provided there is sufficient water, or to load as deep as possible, always afloat, as charterer or agent shall appoint, at wharf, taking balance of cargo in stream. * * * Whenever ordered, the ship is to load and discharge at such safe dock, wharf, or place, always afloat, as charterer or his agent shall appoint. Charterer reserves the option of appointing stevedore for loading at ship's expense."

The place of loading must be safe. As the charterer selects it, he is responsible for its safety. If, therefore, when the cargo was being delivered at the phosphate landing, the wharf, by reason of some defect in it, had fallen in, and the rock had been lost, there can be no doubt that the loss could not fall on the ship. As the wharf must be safe, so, also, the means used in transferring cargo from the shore to the ship in the stream must be safe, "free of expense and risk to the ship." And for this also the shipper is responsible. That is to say, if he uses lighters for this purpose they must be tight, staunch, and seaworthy in all respects, and must remain so as long as they are so used. *Lyon* v. *Mells*, 5 East, 437; *Word* v. *Leathers*, 97 U. S. 379. I say they must remain so. The master had no control whatever over the stevedore. He was selected by the shipper. The provision so common in charter-parties, that the stevedore, though named by shipper, should act under the master's orders, is omitted in this charter-party. So the master could not put a pound of this rock in his ship himself, or receive it in his ship, until it suited the stevedore. For this reason the lighter must not only come along-side tight, staunch, and seaworthy, but it must remain so until the other agent of his principal is ready to discharge its contents. There was not such a delivery of this rock to the master as to put it under his control, and therefore at his risk. *Blaikie* v. *Stembridge*, 95 E. C. L. 908, is a leading case. It was affirmed on appeal. It is quoted in all the text-books, and Maclachlan in his work on Shipping, 415, note 4, quotes *Swainston* v. *Garrick*, 2 Law J. Exch. 255; Consolate 2, Perciss 220, as sustaining it. The court says: "The stevedore was to be appointed by the charterer, and therefore to act for him and represent his interests. For this purpose he had the charge and custody of the goods until they were laden and stowed on board." This same case, construing a charter-party like this in every important respect, only that it has the clause, omitted from this, "that stevedore is to be under master's orders," says: "The cargo is to be brought along-side at the risk and expense of the charterer, and it is to be shipped and stowed by his stevedore; consequently at his risk, though at the expense of the ship-owner." The case of *The Sunlight*, decided in this court and affirmed in the circuit court, (2 Hughes, U. S. 11,) is not in conflict with this case. In the case of *The Sunlight*, phosphate rock, which the agreed statement of facts says was the property of the bark, was brought along-side and put entirely under the control, both as to the rock and the lighter, of the bark and her master. It capsized in the dock, and the bark lost the property. There was no special contract, and the case went off on a supposed custom of the port. This being the result of this contract made between the owners of the Lovspring and the charterer, no receipt or act of the master could alter, amend, or vary any of the terms of this contract. *Burgon* v. *Sharpe*, 2 Camp. 529; Macl. Shipp. 138; *Sickens* v. *Irving*, 7 C. B. (N. S.) 165, 29 Law J. (C. P.) 25; *Manchisa* v. *Card*, 39 Fed. Rep. 495.

Let us look at the case from another point of view. The lighter was sent to the bark in order to fulfill the contract of the shipper. It was loaded with rock intended to be part of her cargo, was put along-side

the bark, and attached to her by lines. It so remained until she sank, with no one to watch her but the master and the crew of the bark, certainly until the stevedore came aboard. As we have seen, it was the duty of the shipper to furnish lighters, tight, staunch, and in every way seaworthy. As these lighters carried his rock to be put aboard ship by his stevedore at such time as he selected, he was bound to keep his lighters in that condition until this was accomplished. As the lighter was loaded by him, it was his duty to see that it was properly stowed, and that it should remain so until discharged by his own stevedore. If, therefore, the lighter capsized because it took in water, not being seaworthy, or because of bad stowage of cargo, he is responsible for it. If the lighter capsized from stress of weather, it is a danger of the sea for which the bark could not be responsible. There was no delay on the part of the bark. The stevedore was not ready to begin loading at any time during which the lighter was along-side the bark. The testimony gives no reason to think that the lighter at any time came into collision with the bark. It certainly did not at the time that it capsized. As the lighter was made fast to the bark by lines furnished in part by and with the co-operation of the tug people, negligence in the mode in which it was made fast cannot be imputed to the bark, in the absence of all testimony to this effect. These are all the causes for capsizing lighters which Mr. Rhodes could give, and he has large experience in handling them. But the master received the lighters, and, notwithstanding the absence of the stevedores and the hour of the night at which they arrived, permitted them to be attached by lines to his bark, and suffered the tug-master to leave them unguarded without objection. Did the bark incur any liability for this? Did her master assume the responsibility of these lighters, seeing that they did not leak, that their cargo was kept properly stowed, that no accident befell them?

Assuming, for the sake of argument, that nothing can be deduced from the terms of the charter-party on this point, and treating it as if it were silent as to it, is there any custom of this port which makes the vessel custodian of lighters bringing cargo at the risk and expense of the shipper? No such custom has been proved. On the contrary, it appears from the testimony of Mr. Rhodes that the White Cross Line, who do a large lighterage business, employ a man specially to visit and care for their lighters. And the tug-master in this case, employed by Capt. Young, another lighterman, only knew that they kept a pump for lighters to be used when the tugs could not be employed in pumping them out. There being, therefore, nothing in the express contract nor in the custom of the port which would make it the duty of the bark to safely keep and care for this lighter, the only other way in which she can be made liable is on the implied contract of the master when he gave the receipt for the two lighters in good order. What was the consideration for this? He was not bound by his charter-party to undertake the care and custody of the lighters, nor by the custom of the port. His freight was secure under his charter-party, and the delivery of the rock on the lighter as a part of his cargo, or withholding it, were equally indifferent

to him. He thus became an unpaid agent, having in possession the property of another, undertaking to keep or perform something about it. Even the master in such a case could not be held liable, except in an action charging his negligence as the cause of the damage, and proving it. *Coggs* v. *Bernard*, 1 Smith, Lead. Cas. (6th Amer. Ed.) pt. 1, p. 419, notes; Story, Ag. 213, 278. 339. Neither of these has been done in this case. *A fortiori* the bark cannot be held in this court in this proceeding *in rem.* Let an order be entered dismissing the libel, with costs.

---

## ON REHEARING.

### (June 11, 1890.)

SIMONTON, J. In deference to the earnest conviction of libelant's proctor, for whom the court entertains great respect, and in view of the importance of this case to the trade of this port, a rehearing has been granted, and the questions at issue exhaustively discussed.

Is the bark responsible for the sinking of the lighter, attached to her by lines, and loaded with rock intended to be a part of her cargo? What is the effect of her master's receipt for the lighter in good order? The charter-party made between the owners of the bark and the charterer, for whom libelant was the agent, is the law of this case. Who is responsible for the seaworthiness and safety of the lighter, from the time she came along-side the ship up to and during the process of loading from it? Under the charter-party the charterer could load her at a wharf, so long as the ship could lie there with perfect safety. When it became unsafe to remain at the wharf she could be loaded in the stream. But the cargo must be brought along-side without expense or risk to the ship, any custom of the port to the contrary notwithstanding. When the ship arrived at this port she was secure of her freight money, whether she took a cargo or not. The charterer was bound by penalty for a full cargo. The libelant, his agent, was under contract to deliver such a cargo. So the loading was solely for the interests of the charterer and of the libelant. The mode of loading was wholly for his convenience, with the one qualification that the ship should be safe. So the libelant selected the wharf, engaged and paid the lighterman, who was under his control, and selected the stevedore for the special purpose of loading in the stream from the lighter. No words qualified the selection of stevedore. It is not said that he is to be employed by the ship, or should act under the direction of the master; only he must be paid by the ship. When libelant sel ted a wharf for the ship at which she was to be loaded, he was responsible for a safe wharf,—safe to hold the goods until they could reasonably have been taken aboard. *Young* v. *Lehmann*, 27 Fed. Rep. 385. So when, for his own convenience and the safety of the ship, he began to load from lighters, he substituted the lighter in the place of the wharf. He was bound to furnish safe lighters,—safe to hold the goods until they could reasonably have been taken aboard. Were we dealing with his responsibility as lighterman only, "that responsibility

would cease then;" or, what is the same thing, "would continue until the cargo is properly placed on the slings, and hooked to the tackle," (Nelson, J., in *The Cordillera*, 5 Blatchf. 519;) and as the loading from the lighter was to be done by his stevedore, using none of the ship's appliances, he could himself control the duration of this responsibility. This, then, was the obligation assumed by the shipper,—a part of his contract. He could not devolve on another the duty of performing it to his own exoneration, without changing the terms of the charter-party. The master had no authority whatever to alter, amend, or waive any one of the terms of the charter-party. Macl. Shipp. 138; Carv. Carr. by Sea, § 44, p. 45. If, therefore, as is contended by libelant, the master accepted the delivery of the rock, and assumed the custody of or responsibility for the lighter, notwithstanding the charter-party, his act was outside of his authority as master, and libelant knew it. His act did not bind his owners nor the ship. If he undertook the less responsible duty of watching the lighter, and of reporting to the libelant at his place of business in Charleston any change in her condition or threat of disaster, so that libelant should meet it, and avert it if possible, this would seem an imperfect obligation. Assuming it to be a legal contract, it certainly is not a maritime contract, as its performance was to be on land. It could create no lien on the ship enforceable in this court. So whatever personal responsibility the master may have assumed in any aspect of the matter, it was not a thing for which the ship is responsible to this libelant. It being the duty of the libelant to furnish a safe lighter,—safe for the purposes of loading a cargo from it to the ship,— this lighter capsized. She was brought to the ship at 8 o'clock at night. At 7 the next morning she had a list. At 2 p. m. she went over. Yet the only evidence at all which we have that she was seaworthy when she arrived is the receipt of the master, given after dark, without examination. We have no evidence, whatever, that she continued seaworthy, or that libelant or his agents ever inquired about it. There was one person whose duty it was to know this, and who must have known it,—the tug-master in charge of the lighter. He was called by libelant, but was not examined in chief on this point. On the cross-examination he said that when he got to the bark he sent a man—his mate—into the hold of the lighter. He does not give his report. We do not know his report. The man was not produced. His name is John Smith. We are equally without any evidence as to her condition at the phosphate works. The only person who could tell — Mr. Alston, who loaded her — was not called. Upon this showing the libelant cannot hold the bark in this proceeding *in rem* for this rock.

It would not be proper to conclude without consideration of a part of the argument challenging the correctness of the conclusion in *Blaikie* v. *Stembridge*, 95 E. C. L. 894. That case determined that, under the terms of the charter-party produced in it, the charterer was in the custody of the goods until they were taken from the lighter and put into the ship. It was used by me as persuasive authority. The case is quoted as authority in all the English text writers to whom there is access, and

by very many English judges. Among these is Sir Robert Phillimore, than whom there is none of higher authority. *The Catharine Chalmers*, 32 L. T. (N. S.) 847, abstracted in 1 Pritchard's Dig. 499. It is not contended that when, under charter-party, the stevedore is selected or appointed by the charterer, this at all times and under all circumstances relieves the ship and its master. On the contrary, there being no demise of the ship, her owners under charter-party with such a provision in it are responsible upon a bill of lading by the master to a shipper who is ignorant of the charter-party. *Sandeman* v. *Scurr*, L. R. 2 Q. B. 86; *The Boskenna Bay*, 22 Fed. Rep. 666; *The St. Cloud*, Brown & I. 4; 8 Jac. Fish. Dig. 12401. When the charter-party provides that, though appointed by the charterer, the stevedore is employed by the ship, and is under the direction of the master, he is an agent of the ship. *The T. A. Goddard*, 12 Fed. Rep. 174. And as the master is always responsible for the navigation of the ship, and the safe carriage and safe delivery of the goods in her, and as the proper stowage of cargo is equally essential to proper navigation and proper carriage, he cannot be freed from this responsibility for good stowage, unless the contract with the owner of the goods expressly declares, or the clear, unambiguous custom of the port provides, that the charterer and his stevedore are alone responsible for stowage. Macl. Shipp. 414; *Sack* v. *Ford*, 13 C. B. (N. S.) 90; *The Boskenna Bay*, *supra; The Keystone*, 31 Fed. Rep. 416. *Blaikie* v. *Stembridge* is commented upon by two judges who have no superiors as admiralty lawyers on the bench,—Mr. Justice Clifford and Judge Brown of New York. Judge Clifford, in *Richardson* v. *Winsor*, 3 Cliff. 404, is deciding a case between the owner and the charterer respecting the responsibility for the act of the stevedore and clerk appointed by the latter, and employed by the former. This English case was quoted. He does not dispute it at all. He distinguishes it from his own case, because the charter-party had a provision the one he was considering did not have: "Cargoes to be brought along-side and taken from along-side at the expense and risk of charterer." The charter-party we are discussing has a similar provision in stronger terms: "Cargo to be brought along-side and taken from along-side without expense or risk to the ship." Judge Brown, in *The T. A. Goddard*, 12 Fed. Rep. 184, does say that *Blaikie* v. *Stembridge* is overruled by *Sandeman* v. *Scurr*. But this last-named case turned wholly upon the fact that the shipper who held a bill of lading from the master of a ship, not demised, was entirely ignorant of the existence of any charter-party; so the ship was liable. The charter-party we are discussing carefully omits the words, "Under the direction of the master," and any provision for assistance by the master or crew of the appliances of the ship. It comes under cases of *The Diadem*, 4 Ben. 247; *The Miletus*, 5 Blatchf. 335; and *Blaikie* v. *Stembridge*. The stevedore was the agent of the charterer. The case has caused considerable trouble, and has raised frequent doubts. Under these circumstances the provision as to costs will be modified. Let each party pay his own costs, and half the other costs. In every other respect the former decree is affirmed.