## THE UNIONIST.

## MYERS *et al.* v. THE UNIONIST.

### (*District Court, E. D. Virginia.* November 30, 1891.)

1. CHARTER-PARTY—CONSTRUCTION—NOTICE OF READINESS FOR CARGO.
    A charter-party provided that it was to go into effect the morning after notice of readiness to receive cargo, such notice to be given before 12 o'clock of the preceding day; that 14 lay-days should be allowed, "Sundays and holidays excepted;" and that the charterers might cancel the contract if the vessel was not ready on or before Christmas day. *Held* that, although this latter provision seemed to make Christmas day available for the purpose of giving notice, yet as the provision for notice of readiness was evidently intended to enable the charterers to get the cargo together and engage laborers for loading, a notice given on that day was inoperative, and the lay-days did not commence until the second day thereafter.

2. SAME—GUARANTY OF INSURANCE—DECK CARGO—CATTLE.
    A printed charter-party gave the charterers a right to put on board a full cargo of cotton, or any lawful merchandise, using all spaces where cargo was usually carried, and the owners guarantied first-class insurance. On the margin of the instrument was written a clause giving the charterers a right to ship cattle on the deck. *Held*, that the charterers could not recover freight for cattle which they would have shipped, but did not because insurance was not obtainable; it appearing that insurance was refused for reasons not calling in question the vessel's seaworthiness, and that shippers did not usually construe the guaranty of insurance as covering deck cargo, especially cattle, unless expressly so provided.

In Admiralty. Libel by Myers & Co. against the steamer Unionist upon a charter-party.

The facts fully appear in the following statement by HUGHES, J.:

The conceded facts of this case are as follows: On the 12th day of September, 1889, the owners of this steamer, through their agents, Messrs. Simpson, Spence & Young, of New York, chartered the steamer to the libelants, Myers & Co., of Norfolk. The charter, or a copy thereof, is annexed to the libel. In the charter the steamer was designated as "trading," and it was provided that she should take on "a full and complete cargo of cotton $\frac{and}{or}$ other lawful merchandise," at Norfolk, Newport News, or West Point, and carry the same to Liverpool or Bremen. The charter in its printed body provided also as follows:

"The entire carrying capacity of the vessel, including cross-bunkers, space under bridge-deck, *lazarette,* deck-houses, and other spaces where steamer has usually carried cargo, or would carry if loaded on rates, shall be placed at disposal of charterers, exclusive of any space which may be needed for the crew, cabin stores, and coal for the voyage; and owners guaranty not to occupy more space for coals below than was occupied on previous voyages from United States to Europe when steamer was loaded with cotton for their benefit, and no goods or merchandise whatever shall be received on board, otherwise than from charterers or their agents, without their consent in writing. * * * If the steamer be not sooner dispatched, fourteen running days, Sundays and holidays excepted, shall be allowed the charterers for loading, such days not to commence before 20th November, unless with charterers' consent. * * * In case the steamer is longer detained by the charterers or their agents, demurrage shall be paid by them at the rate of sixpence per net register ton per day for every like day detained, and it shall in all cases be settled with the captain before the steamer leaves the port of loading, and no claim shall be valid if made after that time; or, if steamer is sooner dispatched, she shall pay the charterers or their agents dispatch money at the rate of ten pounds per day for each and every day so saved. * * * It is agreed that this charter shall not commence until the morning after the steamer is ready to receive cargo at the place of loading, all her holds being cleared and passed for grain, and customary notice thereof is given to the charterers or their agents, and such notice must be given before twelve o'clock on the day the steamer is ready; and if, upon arrival, the steamer is ready for cargo, then lay-days shall commence the morning after the entry is made at the custom-house. Should the steamer not be ready in all respects for cargo at her first loading port for entering on this charter on or before 25th December, 1889, the charterers may cancel the charter. * * * First-class insurance is hereby guarantied by owners of the steamer."

Upon the margin of the policy this clause appeared in writing:

"Charterers to have the option of shipping cattle on deck, cost of fittings to be paid by them, necessary food and attendance on cattle to be provided by shippers; steamer to supply requisite fresh water," etc.

The Unionist was a steel steamer, built in 1888. She was a small steamer, being only 1,403 tons, but she was of the first class. After completing her "trading" engagements, she arrived in Hampton Roads in the afternoon of December 23d, and, under telegraphic orders from the libelants, came that same day to Norfolk. Early in the morning of December 24th the master reported the ship ready to receive cargo, and about noon of the same day announced that she had entered at the custom-house, and that her lay-days would commence on the morning of the 26th. At 8 P. M. of that day the libelants returned the notice,

saying that they did not "consider the Unionist ready for entering on her charter." Immediately the master asked the libelants to state their reasons, and announced that the vessel was ready to take in cargo at all hatches, and that she had been entered at the custom-house. He added, ship's ballast would all be out by morning. In the morning of December 25th, at 9 A. M., the master reported that the ship was free of ballast, and all holds cleared, and that the vessel was ready to receive any description of cargo, and that lay-days would commence on December 26th. On December 26th the master again wrote the libelants, asking for instructions as to loading berth, and later in the day again wrote them on the same subject. The libelants then asked for some delay to consider the subject, and finally, on December 27th, indicated a loading berth for the steamer, to which the Unionist at once proceeded.

*Sharp & Hughes*, for libelants.

*Butler, Stillman & Hubbard*, for respondents.

HUGHES, J., (*after stating the facts.*) The first claim of charterers is of £10 sterling per day for two days alleged to have been saved from the 14 allowed them by the charter for loading, which days were to commence on the morning after the steamer's readiness to receive cargo. The notice of readiness was given on the 25th December, a general holiday; and the contention of libelants is that, this being *dies non*, the legal day of readiness was the 26th December; that the loading days did not commence until the 27th; that hence they had, excluding Sundays and holidays, until the evening of the 13th January for the loading; and that, inasmuch as this was completed on the evening of the 11th January, they are entitled to dispatch money for two days. The respondent contends that, although the charter provides that loading need not be done on holidays, yet it contains no provision that notices may not be given on holidays.

He contends, further, that inasmuch as the charter provides that, "should the steamer not be ready for cargo on or before the 25th December, 1889, the charterers may cancel the charter," this instrument itself made the 25th December an operative day for the purpose of the notice. There is undoubtedly some force in this latter contention; but it must be considered that the object of giving charterers one day to begin the loading of the vessel after notice of readiness is received is to afford them time to get their cargo together, and to engage laborers to do the work of loading. Respondent's contention becomes inadmissible in the present case. Of all days in the year, Christmas is the one in which a charterer would be most unable to make preparation for loading a ship on the day following. The reason of the rule giving a day for preparation applies, therefore, more imperatively in the present than in other cases, and I think the libelants are entitled to two days of dispatch money.

The other claim of libelants is for £273. 15s. as an amount that would have accrued to them as freight on a hundred head of cattle which the charter gave them an option to ship, but which they were unable to

ship, because of their inability to obtain the first-class insurance on cattle which they claim was guarantied to them by a clause of the charter. The charter-party itself is in form a printed sheet, gotten up and used by the charterers in their business in Norfolk. This printed formula contemplates and provides for only such cargo as is carried in the spaces of the ship where she "has usually carried cargo," and this printed sheet embraces a clause in print providing that "first-class insurance is guarantied by owners of the steamer." Cattle cannot be shipped in the "spaces where the steamer has usually carried cargo." They can be put nowhere except on deck, on which sheds of wood have to be constructed for their comfort and safety. On a margin of the copy of the printed formula which became the contract between charterers and ship-owners in this case, there was written with pen and ink a clause giving charterers the option of shipping cattle on deck, under conditions which need not be recited. It is proved that several insurance companies in the United States and Canada were applied to for policies on cattle to be shipped by charterers on this ship on this voyage in the depth of winter, and that all of them refused for reasons which did not bring in question the seaworthiness of the steamer or allege any distrust of her on any ground. The testimony also shows that shippers and experts in such matters do not regard the usual guaranty of first-class insurance embodied in charter-parties as including deck cargo, especially cattle, unless express language is employed to that effect. It is evident to me from the proofs in this case, and the circumstances under which this contract was made, that the minds of the parties to it did not meet in respect to insurance of a deck cargo of cattle, and that it would be inequitable and unreasonable for the court to hold the ship-owners responsible for the failure of the charterers to obtain first-class insurance upon a deck-load of cattle for a voyage across the Atlantic ocean in mid-winter. I will sign a decree allowing two days of dispatch money to libelants, and rejecting their claim of compensation for the loss of freight on cattle which they had the option of shipping.