## THE ASSYRIA.

### DERNIER v. H. BAARS CO.

(Circuit Court of Appeals, Fifth Circuit. December 5, 1899.)

1. SHIPPING — CONSTRUCTION OF CHARTER PARTY — COMMENCEMENT OF LAY DAYS.

The object of providing in a charter party for one clear day after notice of the readiness of the vessel to receive cargo before the lay days shall commence is to allow the charterer such time for preparation, and, unless made so by the terms of the charter or custom of the port, Sunday is not to be counted as such a day, and, where notice of readiness is given on Saturday, the lay days do not commence until Tuesday.

2. SAME—COMPUTATION OF LAY DAYS.

Where a charter party provided that a cargo of lumber should be loaded by the charterer, and should be "furnished" at the average rate of 50,000 superficial feet per running day, the lay days for loading are to be computed on the amount actually loaded, and not upon the amount delivered to the vessel for loading, a part of which was not actually loaded.

3. SAME—DEMURRAGE.

Where, after a cargo was loaded, the master refused to sign the bill of lading presented by the charterer, on the ground that it was incorrect, but, after several days' delay, altered and signed the same, the charterer cannot be charged with demurrage for the time so taken.

Appeal from the District Court of the United States for the Northern District of Florida.

The H. Baars Company, now called the Pensacola Land & Lumber Company, on the 6th of June, 1896, chartered the British bark Assyria, then lying in the harbor of Ship Island, to carry a cargo of resawn pitch-pine lumber from Pensacola, Fla., to Buenos Ayres, South America. The charter party, among other things, contained the following provisions: "The said party of the second part doth engage to provide and furnish to the said vessel a full and complete cargo of resawn pitch-pine lumber, under and upon deck; and the said party of the second part agrees to pay to the said party of the first part, or agents, for the use of the said vessel for the voyage aforesaid: For lumber under decks, ($14 $^{50}/_{100}$) fourteen and one-half dollars, United States gold, per thousand superficial feet, inch measure, intake survey; for lumber delivered from on deck, two-thirds of the above rate,—all without primage,—earned and payable in cash on proper delivery of cargo at port of destination, in United States gold coin, or its equivalent in other gold coin, without discount or allowance; charterers to have the privilege of shipping pickets and [or] palings at half rate of freight for small stowage only. Vessel to proceed in ballast, and with all possible dispatch, direct to the port of loading, to enter upon this charter. Vessel to load at such safe wharf and [or] wharves and [or] anchorage as directed by charterers or their agents. Cargo to be furnished at port of loading at the average rate of not less than (50M.) fifty thousand superficial feet per running day, Sundays excepted. Cargo to be discharged at port of destination at the average rate of not less than (25M.) twenty-five thousand superficial feet per running day, Sundays excepted. Lay days to commence after one clear day from the time the vessel is ready to receive or discharge cargo, and written notice thereof is given to the party of

the second part or agents; and that, for each and every day's detention by default of the party of the second part or agents, ($91.84) ninety-one $84/100$ dollars United States gold per day, day by day, shall be paid by the party of the second part or agents to the said party of the first part or agent. Should the captain order more cargo than the vessel will take, the expense of returning same to the mill to be paid by the vessel. Captain to open hatches whenever practicable during the voyage, to ventilate cargo. Charterers or their agents to appoint and pay the stevedore to load the cargo; do the towage of the ship (viz. channel towage, inward and outward, if at Mobile, harbor removals, and outward towage to sea); take ship's ballast from alongside at such safe place or wharf as they may direct; supply dogs and chains; and to pay wharfage, tonnage, custom-house and quarantine dues (but not fumigation or other special charges), harbor master's fees, consular fees, and pilotage in and out (all at port of loading), at two dollars ($2.00) per load of fifty cubic feet of cargo laden. If required by consignees at Buenos Ayres, vessel is to discharge in the Riachuelo (or Boca) river, at a wharf designated by them, they paying all Boca charges inward and outward, unless vessel loads outward cargo in the Riachuelo (or Boca) river, in which case vessel to pay her own outward charges. Consignees to pay all lighterage required to enable the vessel to reach the wharf, and wharfage until discharged. The cargo to be received and delivered within reach of the vessel's tackle, at the port of loading and discharge. The bills of lading to be signed as presented, without prejudice to this charter. Any difference in freight to be settled before the vessel's departure from port of loading,—if in vessel's favor, in cash, less insurance: if in charterer's favor, by captain's draft upon his consignees, payable ten days after arrival of vessel at port of discharge. Vessel to have an absolute lien upon the cargo for all freight, dead freight, and demurrage. Charterers' responsibility to cease when vessel is loaded and bills of lading are signed. * * * The custom of each port to be observed in all cases, when not otherwise specifically expressed in this charter."

The vessel arrived in Pensacola harbor from quarantine at Ship Island on June 19, 1896, and on the same day reported to the H. Baars Company her readiness to receive cargo. On receipt of this notice the president of the H. Baars Company suggested to the master of the vessel that a portion of her ballast should be discharged, with a view to carrying a larger cargo of timber, and to this the master consented. The master proceeded to discharge the ballast on a lighter furnished by the H. Baars Company, but on the 22d of June he was stopped by the health officers of the state of Florida, and his vessel was sent back to quarantine to finish discharging ballast. The expenses of the vessel to quarantine and return were paid by the H. Baars Company. On the 26th day of June, the vessel returned to her loading berth in the harbor of Pensacola, and on the 27th day of June, which was a Saturday, the master again gave notice to the H. Baars Company of the vessel's readiness to receive cargo. On the same day the libelant began delivering cargo to the vessel, and during the week following delivered large quantities of lumber and timber loaded on lighters, a part of which was stowed on board. On the 7th day of July a severe storm arose, which drove the lighters, which had not been unloaded, away from the vessel's side, and upon the beach, scattering the lumber along the shore. A portion of this lumber was lost. A portion was recovered, and redelivered to the vessel. In the storm the vessel also received damage to such an extent that it was found necessary to discharge her cargo and make repairs. These repairs, and the reloading of the cargo that had been in the vessel at the time of the storm, were completed about the 29th of July, on which day the master served notice upon the H. Baars Company that his vessel would be again ready to receive cargo on the 4th day of August. On the 14th day of August the master served notice on the H. Baars Company that his lay days were out. On the 19th day of August the final delivery of the cargo was made, and on the next day a clear bill of lading was presented by the charterers to the master, who refused to sign the same, claiming that the bill of lading showed excess of pieces of cargo; that it did not have the words "linear" and "superficial" inserted; and that it contained no notice of protest for demurrage. The master continued to refuse to sign the bill of lading up to the 27th of August, when he signed the same, inserting therein all the matters that he had insisted upon. Thereupon the vessel was cleared by the charterers, and sailed for

Buenos Ayres. During the time the vessel was loading the charterers delivered to the ship, on lighters, lumber, including that blown away and scattered during the storm, to the amount of 1,013,775 feet. There was actually stowed aboard the vessel cargo to the total amount of 817,222 superficial feet. Upon the vessel's arrival at her port of destination, the master refused to deliver the cargo to the consignee, unless he was paid the sum of $551.04, which he claimed was due to the vessel as demurrage which accrued at Pensacola. The consignee, as agent of the charterers, paid the amount under protest, and the charterers' consignors refunded the same.

Under a well-proved custom prevailing in the port of Pensacola, the term "resawn pitch-pine lumber," referring to cargo to be furnished under a charter party, includes sawn square timber of the sizes furnished by the charterers in this case. The record contains the evidence of two witnesses, and there was nothing shown to the contrary, that, by the custom of the port of Pensacola, Sunday is not a clear day for the preparation or delivery of cargo.

Immediately on the vessel's clearance, the H. Baars Company filed a libel against the Assyria, setting forth the facts, claiming to recover, among other things, (1) the damage resulting by the wrongful indorsement of demurrage on the bill of lading, amounting to $551.04; (2) the extra harbor fees and towage which charterers had been compelled to pay because of the return of the vessel to quarantine, and the value of the use of the lighter detained during the said return, $98.80. H. W. Dernier, claimant of the bark Assyria, filed a cross libel to recover (1) for the detention of the vessel going to, remaining at, and returning from, quarantine, six days, $551.04; (2) six days' demurrage, $551.04; (3) for detention of the vessel eight days after she was loaded, $730.32; (4) cost of discharging at Buenos Ayres, arising from charterers shipping timber instead of lumber, $200; (5) to recover disbursements made by claimant to charterers for dogs lost and broken, and other small incidents.

On the hearing, the district court decreed as follows: "(1) That the claimant, H. W. Dernier, pay to the libelant, the H. Baars Company, the sum of one hundred and seventeen and $89/100$ ($117.89) dollars, as and for the damages sustained by the said libelant by reason of the return of the bark Assyria to quarantine to discharge ballast. (2) That the libelant and respondent, the H. Baars Company, pay to the claimant and cross libelant, H. W. Dernier, master of the British bark Assyria, the sum of eight hundred and seventy-one and $93/100$ ($871.93) dollars, as and for the damages sustained by the said claimant and cross libelant as master of the said bark Assyria, by reason of the detention by the said libelant and cross respondent of the said bark Assyria after the said bark was laden. And it is further ordered that the costs of these proceedings, taxed at one hundred and thirty-six and $65/100$ ($136.65) dollars, be paid as follows: That the libelant and respondent, the H. Baars Company, pay thereof the sum of ninety-seven and $76/100$ ($97.76) dollars, and that the claimant and cross libelant, H. W. Dernier, master as aforesaid, pay thereof the sum of thirty-eight and $88/100$ ($38.88) dollars,"—from which decree both parties have appealed.

W. A. Blount and A. C. Blount, for Pensacola Land & Lumber Co.
Ben C. Tunison, for Dernier.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge, after stating the case as above, delivered the opinion of the court.

By a provision in the charter party, the custom of the port is to be observed in all cases when not otherwise specifically expressed in the charter party. The charterers contracted to furnish the vessel in the port of Pensacola a full and complete cargo of resawn pitch-pine lumber. By the well-proved custom in the port of Pensacola, resawn pitch-pine lumber included all kinds of sawn pine lumber and square pine timber. It was therefore clear that the charterers had a right to deliver, as they did, pine square timber as a part of the cargo of the vessel, and all contentions of the claim-

ant based upon the alleged wrongful substitution of square timber for boards and planks must fall.

It seems equally clear, considering the proved custom in the port of Pensacola and all the provisions of the charter party, that the clear day which was to follow notice, and to precede the commencement of the lay days, as provided in the charter party, meant more than a calendar day, and, while not necessarily a working day, yet a day which could be lawfully utilized by the charterers to prepare cargo; and as Sunday, the 28th day of June, was not such a day, the lay days should be held to have commenced to run on Tuesday, June 30th. The charter party expressly provides that the lay days which were to be allowed for loading and unloading cargo were not to include Sundays. The object of giving one clear day after the vessel was ready to receive cargo was unquestionably for the purpose of allowing the charterers time to prepare cargo for delivery. Sunday was not a day during which this work could be done. See The Unionist (D. C.) 48 Fed. 315, where the subject is further discussed.

The number of lay days for loading cargo was, by the terms of the charter party, made to depend upon the amount of cargo furnished the vessel, one day being allowed for every 50,000 superficial feet. The contention on the part of the libelant is that the lay days were to be determined by the amount of proposed cargo delivered to the vessel, though not actually stowed aboard, while, on the other hand, it is claimed that the lay days depend upon the cargo actually stowed. The language of the charter party is, "the cargo to be furnished at the port of loading, at the average rate," etc. It otherwise provides that all the labor and expense of loading were to be furnished by the charterers, who were to appoint and pay the stevedore to load the cargo; and that with the loading the master and crew of the vessel had no concern, except to pay the stipulated price at the rate of $2 per load of 50 cubic feet of cargo laden.

From this it seems clear that the intention of the contract was that the cargo should be loaded at the rate of 50,000 superficial feet per running day, and that the number of lay days was to depend upon the cargo loaded, rather than upon the proposed cargo delivered by the charterers practically to themselves, for the purpose of eventually loading the same. The vessel could have no interest in lumber that the charterers might prepare and get ready, but not eventually load. As, by the terms of the charter, the whole business of loading was in the control of the charterers, who could delay or dispatch as they willed, we hold that the term "cargo to be furnished" means, in this charter party, cargo to be loaded, and the lay days must be determined by the quantity of cargo loaded.

In Guerard v. The Lovspring (D. C.) 42 Fed. 856, and in Baldwin v. Timber Co., 142 N. Y. 279, 36 N. E. 1060, charters similar to the one under consideration, and containing a provision for the charterers to do the stowing, were construed to the effect that cargo was not furnished to the vessel until the same was actually stowed on board by the charterer. By the proof as well as the stipulation in the record, 817,222 feet were actually stowed aboard the vessel,

and that quantity, at 50,000 feet per running day, gave 17 days for the number of lay days to be allowed the charterers for loading. The lay days commenced on Tuesday, June 30th, and, excluding Sundays, six had passed when the storm occurred, July 7th. After the storm, the lay days again commenced to run on August 4th, and the 17 lay days expired Saturday, the 17th day of August. The cargo was finally delivered, and the bill of lading presented to the master of the vessel for signature, on August 20th. The libelant admits that 20 days, excluding Sundays, were taken in loading the vessel, and we therefore find that at the time of clearance the vessel was entitled to 3 days' demurrage.

After the bill of lading was presented to the master for signature, he delayed several days before signing the same, and for this delay the vessel also claims demurrage. The reason given for the delay by the master was that therein the cargo was not correctly described, nor was there any protest for demurrage. As the master, after a week's delay, corrected the bill of lading in these respects, and then signed and delivered the same, we are unable to see any reason why he did not do so without delay; and, certainly, there is no good reason to charge the charterers with the delay the master took to deliberate. There is evidence in the record tending to show that the master was waiting to consult owners and obtain money to pay the vessel's expenses, but it is not very material.

The claimant in the court below, in his cross libel, claimed that in the account rendered by the H. Baars Company for loading the vessel, and which account was paid by the claimant, there were overcharges for manifest, harbor master's fees, chains lost, dogs lost and broken, and expenses for stamps and rafts, in all amounting to $33.20. These expenses were not properly chargeable to the vessel, because, under the terms of the charter party, the charterers were to load the vessel, and pay wharfage, tonnage, custom-house, quarantine, and harbor master's fees, etc. The account was settled by the master, apparently without objection, and in a subsequent account for readjustment of charges, which was settled by the libelant, no mention is made of these charges; but as these matters were clearly overcharges, and as in this case the accounts between the parties are generally adjusted, the claim for $33.20 should be allowed.

Following the views herein expressed, the account between the parties is as follows: The vessel owes the libelant $98.80, extra expenses of the vessel on her second trip to quarantine; $551.04, amount of demurrage paid in Buenos Ayres. The libelant owes the vessel $275.52, three days' demurrage, at $91.84 per day; and the further sum of $33.20, overcharges for dogs, chains, etc. The balance due libelant is $341.12, for which amount, with interest at 5 per cent. per annum from August 29, 1896, the libelant should have a decree. The decree appealed from is reversed, and the cause is remanded, with instructions to enter a decree for the libelant for the sum of $341.12, with interest at 5 per cent. per annum from August 29, 1896; the costs of this court to be paid by the appellee and cross libelant, and the costs of the district court to be paid one-half by each party.